Good morning, and may it please the court, my name is Mack Lacey, and I represent Appellants Oregon Natural Desert Association, Western Watersheds Project, and Committee for the High Desert. With me at council table is Stephanie Perrins, and I will try to reserve one minute of my time for rebuttal. In this case, ONDA challenges the Bureau of Land Management's decision to adopt the Southeast Oregon Resource Management Plan, or RMP. The issue here, we have two claims on the merits under NEPA. First, that BLM failed to take a hard look at impacts to wilderness, and second, that BLM failed to analyze a reasonable range of alternatives to the proposed action, and then also on appeal is the separate issue of whether ONDA's other non-NEPA claims are ripe for review. At the heart of both of the NEPA claims is the fundamental flaw of BLM's NEPA process for this RMP, and that is the agency's refusal to consider impacts to wilderness values on more than four and a half million acres of spectacular canyon lands and sagebrush step landscapes in Southeast Oregon's high desert. The case is important not only for the environment, but also because it represents an important legal question, which has not been answered by this court before. If the court rules the way that BLM asked it to, it would be ruling for the first time that BLM can completely neglect looking at wilderness values under NEPA in a land use planning process. And with that said, let me begin... What do you mean by wilderness values? Do you mean the definition in the Wilderness Act or something else? I'm sorry, Your Honor? What do you mean by wilderness values? Do you mean the definition in the Wilderness Act, or do you mean something more general? What do you mean? Yes, the wilderness resource or wilderness values comes originally or first from the 1964 Wilderness Act. Congress first recognized wilderness as a discrete resource or component of our environment on the public lands. Congress again recognized the resource in 1976 in the Federal Land Policy and Management Act or FLPMA. Following those congressional recognitions, then the... You would be using the same definition. That's what I'm trying to find out. Am I using the same definition? Yes. In the Wilderness Act, Congress defined wilderness in terms of roadlessness, naturalness, and outstanding opportunities for solitude or primitive and unconfined recreation. Those are the three key factors that define wilderness. Right. And then there was this survey that resulted in the designation in 1991 and was sent off to Congress. And so if you're saying that the wilderness value should have been included in this EIS other than the already designated areas, right, so are you talking about changes since then? Are you talking about errors in what was designated as wilderness study area? Or are you talking about kind of near misses, i.e. land that has wilderness value but didn't quite make it as to the WSAE? What are you talking about? Both are all of the above, Judge Berzon. ONDA's premise or Appellant's premise when this NEPA planning process began was that the original inventory obviously took place in the 1970s. It was concluded in November 1980. Therefore, not only was it Appellant's opinion that BLM got some of its determinations wrong back in that original inventory but also that conditions on the landscape have indeed changed in the last 25 years and areas that previously weren't considered to have wilderness qualities as defined by the three key factors of wilderness now indeed do. So roads have become overgrown and impassable in an area that may previously have been considered to be roaded and therefore not eligible under that part of the definition now indeed are. And when you submitted your objections and you identified other acres that you thought had wilderness resources, were you specific in pointing what those were and how the changes had affected those lands? Oh yes, Your Honor. When ONDA conducted its inventory which is what you're referring to, ONDA used BLM's own wilderness inventory protocol which the agency set forth in its 2001 inventory handbook. My understanding is that the BLM did not take into consideration any of this information that you presented. Is that correct? Well, I need to correct that ONDA conducted its inventory after this NEPA planning process. So the reason for that is that our position throughout the NEPA process was that BLM, you need to go out and see what has changed on the landscape and see if wilderness quality lands exist and then take them into account in the process. When it became clear, it was clear throughout the process, but when it became very clear at the end that the agency was not going to conduct any sort of new inventory or update its information, that's when ONDA took the BLM manual or the inventory handbook and went out and conducted its own citizen inventory. And in fact that's one of the reasons why the Department of the Interior created that handbook to tell citizens what factors they needed to consider in their own inventories and how they needed to present that information to the agency. What is your view of the relevance of that document? Is it evidentiary in the district court as proof of what should have been done but wasn't? Or is it a separate basis for abuse of discretion and not reconsidering after you've submitted it? Or what is it? Or both of those? Yeah, in the district court, Your Honor, it was presented to show that BLM should have done something and it did nothing. And here's proof. It came after the fact, but here's proof that these values, as we said at a general level in our comments during the whole NEPA process, the values, these key factors of wilderness really do exist out there. And the agency was remiss in refusing completely to look for those during this land use planning effort. Just so I understand, is this wilderness areas that you're talking about areas that are additional acreage beyond the perimeter, periphery of what was originally surveyed? In other words, you've expanded the geographical area. Is it all just an expansion? Or are there parts within the original inventory that BLM certified initially that have changed and therefore are now filling in the holes in the middle? Or is this another compound question where your answer is both? You're correct on the former, Judge Fischer, that ONDA's focus was the areas outside of existing WSAs. ONDA's inventory identified an additional 1.3 million acres that fell within the Department of Interior definition and Congress' definition of what wilderness is on our public lands. So non-WSA roadless areas. This is a practical matter. Could you have gone, kept expanding and expanding using their handbook? Could you have gone and found two million acres, would you decide there's some point at which the boundaries are sufficient? No, what happened was that ONDA inventoried about 2.2 million acres total outside of existing WSAs. And of those 2.2 million acres that ONDA inventoried, they found that 1.2, excuse me, 1.3 of the 2.2 met the definition. So in other words, there are 900,000 acres ONDA's inventory showed did not meet the definition of wilderness. But it's still within a defined area? Within the Vail District. Yes, okay. Within the Southeast Oregon RMP planning area. Right. ONDA has done other inventories in adjacent planning areas in Eastern Oregon. But I gather for present purposes, since we're only talking about NEPA and EISs, you don't have to be right or wrong about this. You simply have to be ballpark, essentially, to demonstrate that it should have been considered. That's correct, Your Honor. And that's why it doesn't matter that ONDA did its inventory after as opposed to during the NEPA process. Appellants suspected throughout that seven-year planning process that indeed there were additional areas out there that contained wilderness quality lands. And that's why they asked for it. How, if at all, does the Utah settlement affect this issue? Because it does seem to suggest that an understanding that there's no further obligation to designate any further additional wilderness lands. Now, first of all, is that binding in this case or is it only binding in Utah? And second of all, does it preclude what would an EIS consider if it couldn't consider designating more wilderness lands? The answer to your first question, Judge Brezon, is that it's not binding in this case. It was a settlement in a case in the District of Utah. Also important to that settlement, I think this is your second question, is that the settlement goes to BLM's duties under FLTMA. And we're dealing with a NEPA claim here on the merits. ONDA, of course, it's our position that under FLTMA, under Section 201, BLM does have a continuing duty to keep up to date on wilderness values and other values on the public lands. Under NEPA, there is a distinct and discrete duty to also take a hard look at impacts to the human environment. And of course, this brief is dedicated to discussing why wilderness is indeed a part of the human environment, an element of that environment like any other. And I do want to emphasize that this morning because throughout its response brief, BLM talks about the wilderness resource in quotes, intimating that this is some sort of made up resource on ONDA's part. But clearly from my answer to your first question, your honor, wilderness is a resource like any other starting from the Wilderness Act and into the Department of the Interior's recognition of the resource and further articulation of the key factors that define it in its handbooks. And then in the RMP itself, in this record at ER page 169, BLM, of course, says, quote, wilderness is part of the spectrum of resource values considered in the land use planning process. So I want to be clear that I don't think there's a question that wilderness is a resource like any other that could and should have been considered. But if one took the view of the Utah settlement that BLM has no authority now to designate any new wilderness areas, then what would be the point of considering it in an EIS? What would they be considering it for? Yes, and thank you for bringing me back to the rest of your question, answering the rest of your question, Judge Grizan. Whether or not BLM has authority to designate new wilderness study areas under FLTMA, it does have authority under FLTMA and an obligation under NEPA to consider some other sort of protective management or some affirmative type of management for lands with outstanding wilderness qualities. Whether it wants to come up with an additional type of designation or simply recognize in an RMP that these outstanding wilderness lands exist and, for example, let's not graze them as heavily or at all, or, for example, let's not close parts or all of these areas to off-road vehicle use, that would be a proactive measure that the agency could take at the land use plan level to protect these wilderness qualities short of designating them as WSAs. The issue, of course, isn't before you on the merits, but it is our position that BLM could designate these areas as WSAs if the agency wanted to. Could you, we could talk about all of these issues at length, but we're under time limits, obviously. Could you move to the specifics of your objections to the OHV alternatives and to the grazing, because I'm not sure I fully understand the impact or the effects here on the OHV. They did, the BLM looked at designations of open and limited. You're considering closing certain areas. Is that correct? That's basically correct. At the RMP level, the regulations require BLM to designate lands under either an open, limited, or closed designation. We have these three categories. Our problem with the EIS here is that while BLM considered a couple different combinations with respect to the open and limited categories, under each and every alternative, the agency did not consider closing more than 0.8% of the lands. Designating more than that tiny amount under the closed category. The reason this is so important goes back to NEPA's dual purposes, of course, of meaningful public participation and informed agency decision making. Without looking at closing certain important environmentally sensitive areas, such as an area with outstanding wilderness qualities or an area with a special fish or wildlife species present, without looking at closing those areas to off-road vehicle use, the EIS hasn't allowed the opportunity to truly examine the positive environmental impacts that we would have from not allowing vehicle use in those areas. If you take wilderness as one example, off-road vehicle use undoubtedly impacts particularly the naturalness criterion of wilderness if you have vehicles running through. What's the boundary between closed and limited? What sets those two separate and apart from each other? I'm trying to understand whether there was any practical effect. BLM argues it doesn't really make much difference here. What's your explanation? There is undoubtedly a practical difference between those categories. In a limited area, there are different types of limitations the agency might impose. At the most basic level, the off-road vehicles are allowed to travel on existing or designated routes in that area, whereas obviously, if the area was completely closed, no vehicle would go in at all. I understand closed means you can't go in at all, but they can restrict it under the limited category fairly substantially, can they not? That's right. They can restrict it substantially, but for example, if we're talking about wilderness values, if you have off-road vehicles even going on limited roads, imagine that there are vehicles that are harassing fish species that live in those areas. If it's closed, that means nobody can get in by any kind of vehicle, is that correct? That's correct. They're going to weigh against total closure. Who's going to enjoy the benefit of all of this wilderness if they can't get in? Hikers and people using the area by non-motorized means, which is what the Wilderness Act and the idea... I went on your website that you cite in the briefs, because it didn't do the nice little thumbnails. I had to open them one at a time, and I didn't get to any of the ones that showed, but I saw a lot of sagebrush desert. Is that the area that you're focused on? It's an incredible diverse landscape. Hikers can go... We have Death Valley in California, and some people are crazy enough to hike across it, but what is the susceptibility of this terrain to hikers as a practical matter? The susceptibility to hikers in terms of environmental... In terms of being able to access it and enjoy it. Hiking across vast acres of wilderness desert with sagebrush. It's a very varied palette of landscapes out there. We have the vast sagebrush... In other words, how far do you have to hike across this to get to a point where the terrain changes enough so that you're getting any of the diversity? It really depends on the particular area. The Owyhee Canyon lands are what run through the heart of this planning area, and off of these canyons... Off of the Owyhee River, you have these little hidden pocket canyons, and then the broad... Is the off-road vehicle... Are they going into those areas? At this point, OHVs are allowed to travel completely cross-country without any concern about roads on about half of the planning area, and then most of the other half is under various forms of the limited designation. Then, as I said, only a very small portion is actually closed to off-road vehicle use. On the grazing, in the same vein, I'm trying to understand... They did come back after the objections with the D2 option. Again, what's the significance of your objection as to as a practical matter? Why isn't that... Why wasn't that a sufficient alternative consideration? The reason D2 didn't make the range of alternatives, a reasonable range of alternatives under NEPA is that not even that alternative considered closing or not allocating parts of these public lands to livestock grazing. Although D2 did add up... You mean it wasn't a zero option? Is that what you mean? There was. There was alternative E, which would have closed the entire planning area to all commodity use. It did consider closing large portions. Large portions, but even BLM admits that alternative E would be illegal to implement. Yeah, but D2 did consider closing like half the territory, didn't it? It would have closed about a third of the planning area. So what didn't it consider? It didn't consider two-thirds? Is that the problem? It didn't consider areas outside of existing WSAs that have outstanding wilderness values. In other words... But then we're just back to the wilderness value problem. That's right. So if you lose the wilderness value problem, you would lose on the grazing? I think that you're right, Your Honor, and that's why, in our opinion, that's the key issue and so important it permeates the rest of the decision. Not necessarily so with respect to the off-road vehicles. That's correct. That would be illegal even without the wilderness issue. All right. I'll give you a couple of minutes for rebuttal. May it please the Court. I am David Shilton. I'm representing the Bureau of Land Management, and I'd like to start with the NEPA question on whether the agency took a hard look at wilderness. The focus of the plaintiff's claim here is the approximately 3.3 million acres that are outside of the wilderness study areas that were designated and determined in 1991. But didn't they look at wilderness, crawl wilderness? You said that, right? BLM looked at wilderness in the wilderness study areas. Right. But outside of wilderness study areas, it looked at naturalness in other conceptual terms, not in Wilderness Act terms. And so our position is that underneath, BLM has the discretion to use its own conceptual categories and doesn't have to use the Wilderness Act framework in order to look at things like naturalness, roadlessness, opportunities for recreation. It looked at all of those factors, and especially if you look at the EIS's discussion of what BLM calls its areas of critical environmental concern, you'll see that some of those discussions are very close to what you might find if you were looking at it in Wilderness Act terms. Just a couple of examples. In discussing the Leslie Gulch area of critical environmental concern, the EIS talks about it being a highly scenic area, which is an attractive destination for visitors seeking a variety of wildland experiences. Now, these are obviously very close to concepts you would find in the Wilderness Act, but I think the point is that NEPA does not require the agency to adopt a particular conceptual framework. And so as long as the agency takes a hard look at all environmental factors... Well, do we have to essentially revisit the issue in the Utah settlement to decide whether you're right? First of all, can't we just revisit the issue in the Utah settlement? Well, we don't claim that the Utah settlement is binding on... Well, suppose it wasn't and suppose we didn't agree with it. Suppose we thought that, in fact, the agency did have the authority and maybe even the responsibility to continue looking for new WSA areas. Then it would be pertinent at this point to consider whether in doing the NEPA statement whether there was potential areas of that kind using the Wilderness Act definition, no? Well, certainly it would be a different case. I think that whether BLM would have to do that in this particular RMP is a different question than whether generally it would have a duty to look at an assessment like on the produced here in order to determine whether it should recommend new wilderness study areas. And there I think it's very important that the inventory that they provided came after the RMP. And I don't think the agency could be expected to consider that where it was not before the agency at the time it was making it. I don't understand that to be their point. Their point seems to be, well, we asked you to do this and we asked you again to do it and you didn't do it and now we're going to demonstrate that if you had done it you would have found something. So we should have done it. Well, I think their point is that they could introduce this after the decision under the NEPA rule that you can bring evidence into a district court to show that the agency just didn't consider some. And that's what they were doing as I understand it. But our response is we considered all of those characteristics that you were concerned about. We considered the status of the vegetation and the naturalness of areas. We just didn't have to do it under that wilderness framework. But nothing in NEPA confines the agency's discretion in how it looks at these and what conceptual categories. So it looked at the same geographic territory, it just didn't apply the Wilderness Act framework. That's correct. And looked at some of the same characteristics like primitive recreation, which is something you would consider in the Wilderness Act. But here the EIS looks at some of these areas of critical environmental concern in terms of the possibilities for primitive recreation. So again, it looked at all of these issues but just not in the Wilderness Act framework. But I think that what Onda was asking for here, there is a conflict with the procedure that's set up in Section 603 of FLFMA. FLFMA mentions wilderness twice. It mentions it in Section 603 of 43 U.S.C. 1782. And it mentions it in the definition section. But the definition just says, for purposes of Section 603, wilderness is as defined in the Wilderness Act. Well, Section 603 sets up a very discreet process. Now you're arguing the issue that wasn't the Utah case. That's right. This is the Utah issue. And I just want to make it clear that I think that the position of Department of Interior, which is reflected in the Utah settlement, is consistent with the law. And nothing in FLFMA would require an EIS to consider whether new wilderness study areas should be added to those that were recommended by the President back in 1992. Again, I don't think the court necessarily needs to reach this issue, but I do want to make clear what our position is on it. And that is simply that the statute very clearly says that this procedure must take place within 15 years. And what you get at the end of the 15 years is a recommendation to Congress. Of course, only Congress can designate wilderness areas. Congress delegated some of its authority to BLM to make recommendations. And what BLM did was it first in 1980 designated what it thought the wilderness studies areas should be on a map, but then it had to make recommendations as to whether these 32 wilderness study areas should or should not be added to the wilderness system. It did that and then did an EIS in 1989 and did its recommendation. There is under FLMPA, I think that's what you call it, an obligation to continue inventorying land for wilderness values. Is that right? There is an obligation to do inventories of resources and values. That's separate from the obligation to do the Section 603 Wilderness Study. So, again, BLM keeps inventories of various characteristics, vegetation, recreation, those sorts of things. It doesn't have to do that in terms, in Wilderness Act terms, because the only wilderness inventory it does is under Section 603 in making those recommendations to Congress. So, again, FLMPA gives a lot of discretion to the agency in how it keeps its inventories. It doesn't force the agency to do it in Wilderness Act terms. In fact, the section that creates the inventory requirement specifically mentions areas of critical environmental concern. The agency should give priority to those areas. So that's why BLM has adopted that framework to consider these natural areas and to protect the natural areas. And so in this EIS, in this RMP, it set out a lot of these areas of critical environmental concern and described how they would be protected. Now, some of those overlap the existing Wilderness Study areas. Others do not. But, again, that is the categories that BLM uses to look at the concerns that plaintiffs have raised here. And I think those are well within the agency's discretion. You can continue down this line a bit if you feel you need to, but I want to make sure I get your view of the grazing and the off-road vehicle issues. Absolutely. On grazing, the alternatives that were considered went all the way from zero grazing in Alternative E to larger amounts of grazing in A, B, C, and D. And then there was D2, which was specifically done to reflect the concerns that had been raised in the administrative process that would have precluded grazing entirely on about a third of the area. That third of the area was areas that BLM believes are most sensitive environmentally. So it was a broad array of alternatives, and that's what NEPA requires. On the off-highway vehicles, the limited category, there was a large variation in the alternatives studied there. The plaintiffs, of course, are saying that there should have been a large variety in the closed category. And what BLM said here was that the limited category gives us enough authority to prevent resource damage that we don't need to consider closing large areas. That's essentially overkill. The main limitation in limited areas is a limitation to existing trails, right? That's certainly one thing they can do. Is that not the primary one? I'm not sure what would be the primary one. That's certainly a common one. Well, it's almost impossible to, one of the problems I have is it seems almost impossible to evaluate the limited options because it depends what the limitations are. And do you go, does the EIS go into what the limitations are? Not on a sort of tract-by-tract basis because that's not really what an RMP is doing. But except that limitations could be anything from, you know, you can only come in once a year to you can only use existing trails, but there are dozens of them. Well, I think, you know, someone who wanted more detail on that could look at what the existing limitations, in fact, are. And there are some maps. But doesn't EIS, in order to evaluate that option, have to take into account what the limitations are? It just seems meaningless to me to just say in general limitations when there's a wide range of them. Well, I think this is such a huge area that for the RMP to go into that much detail to look at each road and what the limitations were would just make it an unmanageable sort of document. Those sorts of detailed looks are taken... Yes, but I'm saying something slightly different. I'm saying that I understand you have a problem going into every limitation, but if you don't go at least into categories of limitations... That is, if you've divided up the options by categories of limitations without saying where each one was, that would have made some sort of sense. But if you just say limitations, how can you evaluate the impact of limitations when the limitations have enormously varying impacts? Oh, I'm sorry. Yeah, I think I misunderstood the question. I think the EIS does talk about each category of limitation. It does? Well, I believe in the sections about roads there is some general material about the fact that restricting vehicles to existing routes has been successful in preventing damage. But again, the RMP being a framework for a plan which controls future decisions I think indicates that it's not going to be at a really refined level of detail on that sort of issue. I did have a more specific question because I did think we were talking basically about trail limitations and I was a little surprised to learn that we weren't. But at least as to the trail limitations, either the EIS or some other document suggests that that limitation is actually a limitation to a 300-yard area on either side of the trail because people can go off-trail 150 yards to camp and so on. Is that right? I believe that's generally the case. But there simply hasn't been evidence that was produced in this administrative record that these limited restrictions have been unsuccessful in protecting areas from damage. And so I think... I thought there was actually quite a lot all around these issues about weeds and plants and the fact that the roads that people in the cars and especially when they go off-trail as they would be allowed to even with the trail restrictions spew non-native plants around and things like that. Well, I think a lot of those details are in the litigation declarations that the plaintiffs produced in the district court. No, I thought they were in the materials. In fact, it was a thrust in the materials that was before the agency. They seem to have spent more time on that stuff before the agency than really on the wilderness issue. They spent a lot of time with all these declarations from biologists and so on about the crusts and the plants and so on. Was that not before the agency? It was all different in the district court? Well, ONDA did provide comments on the draft EIS and those comments raised the issue about off-highway vehicles, but I think it is very general. They didn't raise the specific issues about plants and seeds and the crust and so on. Well, I think they raised those issues, but in a general sort of way. Those declarations that were submitted in the district court, I'm just asking, I don't know. The very lengthy declarations were not submitted to the agency and they were only submitted in the district court? That's correct, and they were in, I believe, considerable more detail than what had been submitted in the administrative process. What happens if this goes forward and it turns out that ONDA was right, that in fact, at least in certain areas, these limited controls aren't working? They go out and check them out. Do they have a remedy at that point? Well, they... ONDA or whomever is concerned about that. They can certainly bring that to the agency's attention and ask the agency to use its authority, the agency has authority to do emergency closures. That's how it would get to a closure then. Right. It's not... There's no solid bottom to what they can do under the limited category. That's just the classification. If it turns out that they are wrong and the limited restrictions aren't working that well, they can either ratchet them up to more restrictive and all the way up to closed, at least on an emergency basis. They could, they could. There's an executive order, in fact, that gives the agency authority. And do you know whether BLM has ever done that, in fact? In this area, I don't know that. I'm sorry, Your Honor, I just don't know whether they have. But I know they've done it in some areas, I just don't know the record well enough on that issue. So in sum, I think that the agency did consider alternatives adequately to make a reasoned decision on this level of planning and that was well within its discretion. Unless there are questions, that's all I have. Thank you. It would be helpful... Let me tell you what I'm struggling with. I'm having a hard time... Except if we reach the merits of the issue of whether we can redesignate wilderness land. Understanding why the Wilderness Act definition as such gets imported into a NEPA requirement as opposed to, as they say, some other way of reaching similar considerations. Why do they have to directly address whether the wilderness, whether certain areas meet the Wilderness Act definition, which seems to be what you're saying. Yes, Your Honor, and I... It's because NEPA is about disclosure. It's about informed agency decision-making and... That's true, but it's not about enforcing different statutes. Especially because it wouldn't be about enforcing other statutes. In other words, you're asking for a particularized definition of wilderness, which is not self-apparent, and that they have to use that definition and go through that exercise. Why do they have to do that? The definition of wilderness, there's one and only one definition. It comes from the 1964 Wilderness Act, but then it was adopted by the Department of Interior in its handbooks and acknowledged by BLM in the RMP process. So there isn't a question, Your Honor, about whether there are other alternative definitions. They say, for example, that when they are looking at areas of critical environmental concern, they're looking at somewhat similar considerations. Why do they also have to look specifically at the wilderness definition? Right, this is the proxy argument, which... Well, it isn't exactly a proxy argument, at least I wouldn't catch it as such. I would say, where are you getting the requirement that we look at this categorization instead of our categorization? I think we need to bring it back to Section 102.2c of NEPA, which is the basic requirement that we begin with, that the agency has an obligation to look at environmental consequences to the human environment and wilderness. And so, for example, suppose they look at it and they say, well, one consequence is that if we do this, if we have these off-road vehicles, we'll have more roads, and that will make our... They do that in one place. And then in another place, they say, and if we do whatever it is we're considering, we may affect some endangered species. And then in another place... And so that's their way of organizing the world. Now, why do they have to use your way of organizing the world, just because it happens to be in some other federal statute? The big problem stems from the fact that even if BLM wanted to use some sort of proxy approach or its own... But it's only a proxy if you have a requirement in the first place, and I want to know where you're getting the requirement in the first place to use that categorization instead of some other. Right. And in the first place, BLM has the obligation under NEPA to disclose the components of the human environment that are present and the impacts to the human environment. And during this NEPA process, the record shows that the agency would not revisit, in its own words, the wilderness issue. So in other words, the public was never told that BLM was going to look at other things, other components, and apply that information to wilderness, because BLM explicitly washed its hands clean of the wilderness issue. Let's assume for the moment, because I agree with you that if we get into the Utah issue, then you could be right. But if we don't get into the Utah issue, are you arguing the Utah issue for us? You're arguing that we should get into it? Should, I'm sorry. Should we get into the Utah issue? I don't believe so, Your Honor. All right. So let's assume we don't. And if we don't, i.e., if we agree that they have no obligation to redesignate anything as wilderness after 1991, no obligation to do that, then why do they have an obligation to look at it in those categories? Well, in this CIS, BLM looked at, as it says, 20 other resources, and wilderness is the one resource conspicuously omitted from this long list of other resources that were readily looked at in the plan. And to touch on the ACEC issue, I see I'm over my time, but I'll address this last point, if I may. The government points to ACECs a number of times in its brief in an argument today, and I do want to point out that at FER, pages 4 and 14, BLM's ACEC manual, or handbook, rather, the agency explicitly says that ACECs shall not be used as a substitute for wilderness. And so, again, without BLM having told the public that we're going to use ACECs in some of these other categories. Let me give an example of what's bothering me, if I can. I mean, there's also a Wild and Scenic Rivers statute, right? Okay. Do they have an obligation to look, to take that categorization in any NEPA statement and just decide whether they're in Wild and Scenic Rivers? Yes, they do, and they did in this plan. For Wild and Scenic Rivers, BLM made recommendations whether Congress should... I don't know enough about the statutes to know if they're parallel, so I can't really answer that. Or I'm just... It's the importing of a definition from one statute to another and making it a requirement that they use it is what's troubling me. Well, NEPA doesn't define or specify all of these other resources, like fish and wildlife habitat or Wild and Scenic River values or domestic livestock grazing. NEPA simply says that the agency must disclose and analyze impacts to the human environment. Certainly, it's not a limitation on their obligation whether the impact is covered by another federal statute, right? Even if it's not covered by another federal statute, they still can have an obligation to do it. They do have an obligation under NEPA. Right. I have one other factual correction, if I may have one further moment, Your Honor. A moment. Thank you. You were discussing whether the public, and specifically ONDA, had raised all of these different environmental issues and counsel... Specifically. Right, and counsel suggested that those weren't raised to the level that they were in the declarations you were referring to in the record. And I'll point the court to SER pages 900 plus. These are ONDA's 38-page comments submitted in 1999 that addresses all of the issues before the court this morning and a whole host of other environmental issues in a lot of detail. Okay. Thank you. Thank you, counsel. I've been saying interesting case all day, all morning. This was another interesting case and we appreciate the arguments and the briefing. Thank you. The case argument is submitted and we will be in recess until tomorrow. Thank you.
judges: Fisher, Berzon, Barzilay